**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOKA**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ' | |
| | ' | |
| **VS.** | ' | **CAUSE NO. 3:06-000014-017** |
| | ' | |
| **GABRIEL MARTINEZ** | ' | |
| | ' | |
| | ' | |

**DEFENDANT GABRIEL MARTINEZ'S**
**SENTENCING MEMORANDUM**

COMES NOW the Defendant, GABRIEL MARTINEZ, ("Martinez") by and through undersigned counsel and submits this Sentencing Memorandum:

## I.    LAW GOVERNING SENTENCING

### A.    Sentencing Guidelines

*1.    Advisory Application of the Sentencing Guidelines*

On January 12, 2005, the United States Supreme Court held that the mandatory application of the United States Sentencing Guidelines violated the Sixth Amendment to the United States Constitution.  *See United States v. Booker*, 125 S.Ct. 738, 756-57 (2005).   Under *Booker*, no constitutional violation inheres when the guidelines are applied on an advisory, rather than mandatory basis, but sentencing courts must still calculate and consider the applicable guidelines range as one factor in determining the appropriate sentence. *See id.*

2.    *Standard of Review Post-Booker*

Following *Booker*, a defendant's sentence must be reviewed for "unreasonableness." *See Booker*, 125 S.Ct. at 765. In *United States v. Rita*, 127 S.Ct. 2456 (2007), the Supreme Court addressed the question of whether a within-guidelines sentence should be afforded a presumption of reasonableness on appellate review. In its opinion in *Rita*, the Court held that appellate courts may afford within-guidelines sentences a presumption of reasonableness on appeal. *See Rita*, 127 S.Ct. at 2462-63. The Court emphasized, however, that this presumption applies "only on appellate review" and not at the sentencing stage. *See id.* at 2465. The Court stated that "the courts of appeals' 'reasonableness' presumption, rather than having independent legal effect, simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." *See id.*

While upholding an appellate reasonableness presumption, however, the Court opined in *Rita* that application of a presumption of unreasonableness to a non-guidelines sentence would not pass constitutional muster. *See id* at 2466. Indeed, in *Gall v. United States,* 128 S.Ct. 586 (2007) and *Kimbrough v. United States*, 128 S.Ct. 558 (2007), the Court expanded upon its holding in *Rita*. In *Gall* and *Kimbrough*, the Court rejected a de facto presumption of unreasonableness for out of guideline sentences, reiterating that all sentences—including downward variances from the guidelines—may be reviewed only for reasonableness under the deferential abuse of discretion standard. *Gall*, 128 S.Ct. at

597. Under *Gall*, sentencing courts may not require extraordinary circumstances in order to impose a non-guidelines sentence. *Id.* at 594-95. After *Rita*, a sentencing judge is free to disagree with the policy judgments upon which the guidelines are based and to vary from them on that basis of such disagreement. *Kimbrough*, 128 S.Ct. at 574.

### 3.    The Sentencing Process as Explicated in Rita

In *Rita*, the Supreme Court detailed the process for sentencing. Writing for the majority, Justice Breyer explained:

> The sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines. He may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, . . . perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.

*Rita*, 127 S.Ct. at 2465 (internal citations omitted).

Thus, as set forth in *Rita*, this Court must engage in a classic guidelines and departure analysis followed by an exhaustive review of the § 3553(a) factors. In determining the sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]" a district court must not apply a presumption of

reasonableness to the calculated guideline range, but rather "must . . . consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 2472-73 (Justice Stevens concurring) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).

The Section 3553(a) factors that this Court must consider are as follows:

> **(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
>> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>> **(2)** the need for the sentence imposed--
>>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>> **(B)** to afford adequate deterrence to criminal conduct;
>>> **(C)** to protect the public from further crimes of the defendant; and
>>> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>> **(3)** the kinds of sentences available;
>> **(4)** [guideline sentencing range]
>> **(5)** any pertinent policy statement . . .
>> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>> **(7)** the need to provide restitution to any victims of the offense.

Martinez Sentencing Memorandum - Page 4

18 U.S.C. § 3553(a)

Accordingly, Mr. Martinez submits the instant Sentencing Memorandum to assist the Court in assessing the Section 3553(a) factors in this case to arrive at a sentence that is sufficient, but not greater than that necessary, to comply with the purposes of sentencing.

## II.    **ARGUMENT**

Thirty years ago, in 1978, Jimmy Carter was the President of the United States and Bill Gates had been out of high school for five years. That year, at Wimbledon, Martina Navratilova defeated Chris Evert at Wimbledon and in the major leagues, Pete Rose got his 3000th hit. Annie Hall won the Oscar for Best Picture and Louise Brown, the first test tube baby, was born in England. The internet, cable television and cellphones did not exist. The world of today is so vastly and substantively different from the world of thirty years ago as to be barely recognizable.

Just as an inmate released into our world after having spent thirty years behind bars would be overwhelmed by the changes, so will today's offender who spends the next three decades in prison not recognize the society he re-enters in 2038. There is no way to predict the technological, political and demographic developments that will transpire. What is certain, however, is that in thirty years, Mr. Martinez will be a sixty year-old man whose perspective undoubtedly will have evolved as much as world around him. In short, thirty years is a very, very long time.

For the reasons discussed more fully below, the defendant respectfully requests a

Martinez Sentencing Memorandum - Page 5

sentence of thirty years (360 months), or in the alternative, any term of years the Court believes appropriate. A sentence of thirty years—or indeed any term of years—would serve the purposes of providing just punishment for Mr. Martinez's crimes, deterring others and protecting the public. Moreover, in contrast to a life sentence, a sentence of a term of years that permits him to earn good time credit would provide Mr. Martinez with an incentive to conform to the rules in prison and to make some effort to salvage some part of his life.

A. Nature and circumstances of the offense and history and characteristics of the defendant.

In the United States' Sentencing Memorandum ("Prosecution Sentencing Memorandum") regarding Gabriel Martinez, the prosecution has provided the Court with a summary of the information provided by a number of co-conspirators regarding the offense. From these various versions, a picture emerges of a drug organization in which the rule was to kill or be killed. It is undisputed that the leader of this organization in the United States was Jorge Arandas ("Sneaky") and that it was Sneaky who reported directly to the kingpin, Sneaky who directed and managed the vast drug distribution organization and Sneaky who gave the orders to kill. PSR at ¶¶77, 78; Prosecution Sentencing Memorandum at 5-15. That Sneaky would not hesitate to kill any subordinate who disobeyed him was graphically demonstrated to Mr. Martinez and others in March of 2004. Prosecution Sentencing Memorandum at 2. In March of 2004, Sneaky himself shot Omar Arizpe, who lost his leg in the attack and spent a month in coma, all for

refusing Sneaky's request to tell authorities that money seized from Sneaky in a traffic stop came from a legitimate source. *Id.*

While the government attempts to portray Mr. Martinez as nothing more than a remorseless killer, the statements set forth in the Prosecution Sentencing Memorandum tell a more nuanced story. As an initial matter, of course, Mr. Martinez was fully aware from the Arizpe incident that the penalty for disobedience to Sneaky was likely death. Details provided by Mr. Martinez's girlfriend, Rosalba Botello-Ochoa give credence to this dynamic. Ms. Botello-Ochoa explained to the government how she overheard a conversation between Sneaky and Mr. Martinez and Mr. Martinez later told her that Sneaky was "very upset and needed the money" from Avila. Prosecution Sentencing Memorandum at 13. Ms. Botello-Ochoa described Mr. Martinez as having been himself "upset" following this conversation with Sneaky and having needed to "assure[] Arandas that he (Martinez) was going to take care of things." *Id.* In an attempt to minimize his own role, Michael Petzold told the government in his debriefing that when Sneaky asked him to shoot Avila he "declined." *Id.* at 8. This version of events is contradicted by the statement of Timothy Bauman who overheard Petzold tell Sneaky that "they were ready to go" when Sneaky asked Petzold to kill Avila. *Id.* at 10. Indeed, the various statements set forth by the government command the conclusion that no one—including Petzold and Martinez—said no to Sneaky.

That Martinez had some concern for others in his commission of the offenses to which he has pled is also illustrated by the statements provided in the government's own

Martinez Sentencing Memorandum - Page 7

pleading. For example, Martinez's awareness that there were children in Avila's trailer and his resultant attempts to get Avila to leave the trailer for their meeting are corroborated by the statements of Petzold, Noe Mireles and Michael Wright. Prosecution Sentencing Memorandum at 8, 12, 15. Moreover, there is some evidence that Mr. Martinez ordered his co-conspirators out of the trailer before shooting Avila. *Id.* at 9, This attempt to spare his cohorts, as well has Mr. Martinez's desire to deal with Avila outside the presence of his children, demonstrates a somewhat mitigating degree of care for others.

Finally, while the government seeks to deny Mr. Martinez any credit for having pled guilty after jury selection in this case, the reality is that his plea did in fact save the government the significant time and resources that it would have expended to try this case. That he did so is a factor this Court may consider in imposing sentence. In addition, this Court may consider that the government elected to give a deal to Sneaky himself -- the leader of the conspiracy and the man who gave the orders that his subordinates dared not disobey.

> B. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

One of the three key objectives of Congress in passing the Sentencing Reform Act

Martinez Sentencing Memorandum - Page 8

of 1984 that ultimately resulted in the creation of the United States Sentencing Commission and the United States Sentencing Guidelines was to achieve "reasonable uniformity" of sentencing. USSG Ch. 1, Pt. A(1)(3), intro. comment. Thus, Congress sought to "narrow[] the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." *Id.* Prior to the Supreme Court's latest sentencing pronouncements in *Gall* and *Kimbrough*, many federal circuits—including the Eighth Circuit—had held that departures based upon that disparities among state and federal offenders were impermissible. *See e.g. United States v. Jeremiah*, 446 F.3d 805, 807-08 (8th Cir. 2006). As discussed *supra*, however, in *Kimbrough*, the Supreme Court expressly held that sentencing courts are free to disagree with the policy considerations that underpin the Guidelines and to vary from the Guidelines accordingly. *Kimbrough*, 128 S.Ct. at 574. A 2007 decision of the Eighth Circuit recognized this implied limitation of the holding of *Jeremiah*. *See United States v. White*, 506 F.3d 635 (8th Cir. 2007) (affirming a downward variance from the applicable guideline range based in part upon consideration of the much lower sentence in Iowa state court for certain conduct that markedly increased the applicable Guidelines offense level).

Even if the Court were to grant Mr. Martinez's request and sentence him to thirty years' incarceration or a term of years with the possibility of eventual release, Mr. Martinez will spend almost all of his adult life behind bars. Moreover, an examination of the circumstances of several cases that were prosecuted in the state system in North Dakota demonstrates that a life sentence for Mr. Martinez with no possibility of release

will result in a sentence that is more severe than those imposed upon offenders convicted of analogous offenses in state court.

In 2006, North Dakota's longest-serving inmate, James Iverson, was granted parole after having served nearly forty (40) years in state prison. Selection of Iverson newspaper articles, attached as Exhibit A; *see also,* Order of Parole, dated October 6, 2008, attached as Exhibit B. Iverson was convicted in 1969 of having brutally strangled two young women in Grand Forks. Iverson was a taxi driver who often took the victims to work in the morning. *See generally, id.* In the more recent case of Wade Radermacher, the defendant shot his stepson six times with a rifle and shot his wife once. Radermacher pled guilty to murder and reckless endangerment in June of 2006. Bismarck Tribune article, dated June 22, 2006, attached as Exhibit C. He received a sentence of twenty years in prison, with eight years suspended for murder and five years in prison for reckless endangerment. Criminal Judgment, filed June 19, 2006, attached as Exhibit D. Radermacher's projected release date is December 22, 2014.

The facts of the instant case are certainly less egregious than those of the Iverson killings, in which the victims were two young innocent women and the Radermacher case in which the victim was a teenager. In this case, the victim was a knowing participant in criminal conduct and Martinez committed the crime under orders received from the head of a ruthless drug organization. To impose a sentence in this case that does not permit the possibility of eventual release is to engender disparity among offenders convicted of similar criminal offenses that derives not from the circumstances of the offenses

Martinez Sentencing Memorandum - Page 10

themselves, but from the jurisdiction in which the offender is charged. This type of unwarranted disparity does not serve the purposes of sentencing set forth in 18 U.S.C. §3553(a).

            C. <u>The need for the sentence imposed to protect the public from further crimes of the defendant; the kinds of sentences available; and the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.</u>

A sentence of thirty (30) years will necessarily protect the public from further crimes of the defendant for the foreseeable future. Section 3553(a) of Title 18 provides in what is termed as the "parsimony provision" that a sentence must be sufficient, *but not greater than necessary*, to comply with the purposes of sentencing. Thus, while a life sentence would undoubtedly serve the purpose of preventing future criminal conduct by Mr. Martinez, there is some indication that such a sentence is greater than necessary to achieve that purpose long term. Analysis of recidivism rates among a cohort of prisoners initially sentenced to life who were ultimately released has shown that released lifers "have very low rates of recidivism, including for violent crimes." Mauer, King and Young, *The Meaning of "Life": Long Prison Sentences in Context*, 2004, available at http://www.sentencingproject.org/PublicationDetails.aspx?PublicationID=348, at 23-24. Indeed, " [l]ifers are less than one-third as likely as all released offenders to be rearrested within three years of release from prison." *Id.* at 24.

Moreover, the United States Sentencing Commission similarly has noted the

strong inverse relationship between offender age and recidivism. *See* Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, available at http://www.ussc.gov/research.htm, at 12; Exhibit 9. The Sentencing Commission's research has demonstrated, for example, that the recidivism rate of offenders over age 50 is only 9.5 percent, markedly lower than that for inmates of all ages. *Id.*

Balanced against the decreasing need for incapacitation of offenders as they age is the very real and significant financial cost of keeping aging prisoners in prison until they die. Research has shown that while the average annual cost of incarceration of an inmate nationwide is $20,000, the cost of maintaining an aging prisoner may be as high as $69,000 per year. Mauer, et al., "The Meaning of Life," *supra,* at 25. Thus, current estimates are that it costs taxpayers an average of $1 million to incarcerate a thirty year old prisoner for life, with forty percent of that cost being incurred in the last ten years. *Id.* Thus, the cost of maintaining an aging prisoner increases exponentially at the end of his life when he is least likely to pose a risk to society.

Finally, and importantly, the Bureau of Prisons recognizes the value of good time credit in encouraging inmates to conform their conduct to the rules while incarcerated. A defendant sentenced to life is ineligible to receive "good conduct time" reductions. Legal Resource Guide to the Federal Bureau of Prisons, 2008, available at www.bop.gov/news/PDFs/legal_guide.pdf, at 13. In this case, imposition of a thirty year sentence, or any other term of years, would serve the salutary purpose of giving Mr.

Martinez a strong incentive to comply with BOP rules and regulations.

### III.    CONCLUSION

Mr. Martinez submits this Sentencing Memorandum to assist the Court in performing the required analysis under 18 U.S.C. § 3553(a).  This Court has the discretion to sentence Mr. Martinez to a thirty year (360 month) term of imprisonment or to any other term of years it believes is warranted.  A non-life sentence takes into account the nature of the offense and Mr. Martinez's role in it, as well as the savings of time and money the government enjoyed as a result of not having to try this case.  Moreover, by permitting Mr. Martinez to earn good conduct time, a sentence of a term of years would protect the public during Mr. Martinez's statistically most dangerous years, maximize the utility of the public tax revenues spent to incarcerate him and increase the chances that Mr. Martinez will comply with prison rules and regulations.  In short, such a sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,


THOMAS A. DICKSON
North Dakota Bar ID# 03800
JODI L. COLLING
North Dakota Bar ID # 05854
Dickson Law Office
Tuscany Square
107 West Main, Suite 150
P.O. Box 1896
Bismarck, ND 58502-1896


MARLO P. CADEDDU, P.C.
Texas Bar Card No. 24028839
Law Office of Marlo P. Cadeddu, P.C.
3232 McKinney Avenue
Suite 700
Dallas, Texas  75204
Telephone: 214.220.9000
Facsimile: 214.744.3015

ATTORNEYS FOR GABRIEL
MARTINEZ